# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 10-1157 (JFB) (ETB)

————————————

BERNADETTE NEAL,

Plaintiff,

VERSUS

JPMORGAN CHASE BANK, N.A.,

Defendant.

————————————

**MEMORANDUM AND ORDER**
August 8, 2012

————————————

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Bernadette Neal ("Neal" or "plaintiff") brings this civil rights action against her former employer, JPMorgan Chase Bank, N.A. ("Bank" or "defendant"), alleging that defendant discriminated against her on the basis of race and retaliated against her during her employment with its subsidiary, Chase Auto Finance ("CAF"), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as amended ("Title VII"), as well as New York State law.[1] Specifically, plaintiff alleges that she was discriminated against because she

did not receive appropriate training and coaching and then received a Written Warning, and all of plaintiff's team, who were minorities, were written up within days of each other by their new supervisor. Additionally, plaintiff asserts that Human Resources failed to correct errors in plaintiff's work record concerning her use of Family and Medical Leave Act ("FMLA") leave. Plaintiff also asserts that the Bank retaliated against her after she filed an Equal Employment Opportunity Commission ("EEOC") discrimination charge on January 7, 2008 against the Bank by (1) giving her a negative performance evaluation and denying her a salary increase in 2008; (2) transferring her to five different supervisors in two years; (3) providing her with fraudulent pay statements in 2009; and (4)

---

[1] Although plaintiff did not specify statutes in the complaint, which she originally filed in state court, the Court construes the complaint liberally to raise both federal and state discrimination and retaliation claims.

making it difficult for her to take FMLA leave.

The defendant moves for summary judgment, arguing that (1) the action should be dismissed because plaintiff entered into a valid agreement with the Bank when she was terminated accepting the Bank's offer of severance benefits in return for releasing the Bank from any claims plaintiff had against it; (2) most, if not all, of the actions plaintiff complains about were not adverse employment actions; (3) the Bank articulated legitimate non-discriminatory reasons for its actions regarding plaintiff; (4) plaintiff has produced no evidence to show that the Bank's reasons for its actions regarding her were a pretext for racial discrimination; and (5) plaintiff cannot prove that defendant retaliated against her.

For the reasons set forth below, defendant's motion for summary judgment is granted. Based upon the uncontroverted evidence, the Court concludes, as a matter of law, that plaintiff voluntarily and knowingly entered into a valid agreement with the Bank when she was terminated accepting the Bank's offer of severance benefits in return for releasing the Bank from any claims plaintiff had against it. Even assuming, *arguendo*, that the release was invalid, the Court further concludes, construing the evidence in the light most favorable to plaintiff, that no rational jury could determine that plaintiff was discriminated against on the basis of her race, or that she was retaliated against for engaging in protected activity.

## I.   FACTUAL BACKGROUND

The facts, construed in the light most favorable to plaintiff, the non-moving party, *see Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005), are as follows:

### A.   Plaintiff's Background

Plaintiff, who is Black, attended and graduated with honors from Andrew Jackson High School in 1988. (Def.'s Rule 56.1 Statement ("Def.'s 56.1") ¶¶ 1-2.) She attended Long Island University ("LIU") on a full-time basis from 1999 until 2001. (Def.'s 56.1 ¶ 3; Pl.'s Rule 56.1 Statement "Pl.'s 56.1" ¶ 3.) While at LIU, Neal took more than 48 credits towards a major in Finance in such areas as "accounting, finance, law, business [and] marketing," and was on the Dean's List. (Def.'s 56.1 ¶ 4.)

Defendant is a national banking association, that, through its Retail Financial Services line, operates Chase Auto Finance ("CAF"), which provides financing to individuals and dealers for the purchase of automobiles. (Def.'s 56.1 ¶¶ 16-17.) Neal was hired by defendant, effective November 13, 2006, to work for CAF. (*Id.* ¶ 18-19.) She had a New York Life, Accident & Health Insurance producer/broker's license at the time. (*Id.* ¶ 6.) She was an at-will employee employed part-time (20 hours per week) as a Customer Service Representative ("CSR") in CAF's Call Center in Garden City, New York. (*Id.* ¶¶ 20-23.)

### B.   The Release Agreement

JPMorgan has a Severance Pay Plan that sets forth certain benefits that may be available to eligible employees. (*Id.* ¶ 25.) The Severance Pay Plan offers various forms of assistance, including financial assistance, to employees whose employment involuntarily terminates as a result of the events specified in the Plan. (*Id.* ¶ 26.) One of the events specified in the Plan is the elimination of the employee's position. (*Id.* ¶ 27.) The Severance Pay Plan conditions the payment of severance benefits on the execution of a release. (*Id.* ¶ 28.)

Sometime in 2008, CAF advised its Garden City Call Center employees, including Neal, that it was going to close the Call Center and eliminate all of the CSR positions at that location. (*Id.* ¶ 29.) On or about October 3, 2008, Human Resources Business Partner Elizabeth Dorritie ("Dorritie") provided Neal and other CAF employees with formal written notice that their positions were being eliminated and their employment would be terminated as of December 1, 2008. (*Id.* ¶ 30; Pl.'s 56.1 ¶ 27.) The notice letter provided Neal with sixty (60) days paid notice of the elimination of her position and the proposed termination of her employment. (Def.'s 56.1 ¶ 31.) The notice letter also offered Neal four (4) weeks of severance pay if she did not obtain another position with JPMorgan during that period, on the condition that Neal execute a proposed Release Agreement ("Release" or "Release Agreement"). (*Id.* ¶ 32.) Neal had no other right to any severance benefits. (*Id.* ¶ 33.) Defendant encouraged Neal to consult an attorney regarding the proposed Release Agreement, and gave her forty-five days in which to execute and return the agreement in order to agree to its benefits.[2] (*Id.* ¶¶ 34-35.) Neal chose not to consult an attorney, and did not ask any questions about the Release Agreement of a CAF representative. (*Id.* ¶¶ 37-38.)

The Release Agreement, which is five pages long, includes the following relevant language: "I hereby release JPMorgan Chase & Co. . . . from all liability for any claims or potential claims relating to my employment with the Company and/or the termination of my employment, subject to the exceptions listed below. I understand that 'claims'

includes claims I know about and claims I do not know about, as well as the continuing effects of anything that happened before I sign below." (Def.'s Mot. for Summary Judgment, Ex. 7, Mar. 21, 2011, ECF No. 26-2.) The Release Agreement lists some of the claims that are covered by it, including claims under Title VII of the Civil Rights Act of 1964 and claims of retaliation. (*Id.*) The Release Agreement further states, "I agree that I will not file a lawsuit or initiate any other legal proceedings for money or other relief in connection with the claims I am releasing above." (*Id.*) Finally, the Release Agreement states, "By signing below, I confirm that I have read this Release, understand it, agree to it and sign it knowingly and voluntarily. I agree that I am signing this Release in exchange for benefits to which I would not otherwise be entitled. I am hereby advised to discuss this Release with an attorney of my choosing (at my own expense)." (*Id.*) Under the line, "Intending to be legally bound, I, Bernadette Neal, hereby sign the foregoing Release this 4th day of November, 2008," Neal signed the form and had it notarized. (*Id.*)

### C.    Customer Service Representative Duties and Responsibilities

At CAF, CSRs were responsible for performing a variety of service and sales functions. (Def.'s 56.1 ¶ 47.) Each CSR handles approximately 80-100 calls a day from CAF customers (including car dealers), for which they must meet quality, productivity, sales, and sign-in time measures. (*Id.* ¶ 48.) During these calls, CSRs are responsible for resolving financial and non-financial customer questions, and are expected to recognize sales opportunities, be able to describe features and benefits of Chase products and services, and to explain required disclosures. (*Id.* ¶ 49.)

---

[2] Plaintiff states that defendant "sought to have the agreement signed by close of business November 5, 2008," as opposed to November 17, 2008, which was forty-five days from October 3, 2008. (Pl.'s 56.1 ¶ 29.)

After plaintiff was hired as of November 13, 2006, she went through a paid training period and then began working as a CSR in mid-January 2007. (*Id.* ¶ 50.) In January 2007, CAF's Customer Service Managers distributed to the new CSRs the "2007 Customer Service Performance Guidelines" (the "Guidelines") and the "2007 Quality, Productivity & Service to Sales Standards" (the "Standards"). (*Id.* ¶ 51.)[3] The Guidelines listed performance objectives referred to as "Quality Score", "Offer Rate", "Acceptance Rate", "Signed in Time", "Average Handle Time" and "Available Time." (*Id.* ¶ 52.)[4] The Guidelines set out a transitional progression of compliance with the performance objectives that would be expected of new CSRs during their first three months working in the Call Center, increasing on a monthly basis from the first full month in the Call Center to the fourth month, when the new CSRs are expected to achieve the full level of all the performance objectives. (*Id.* ¶ 53.)

Plaintiff failed to meet the business objectives standards at least 9 times in a rolling 12-month period through October 2007. (*Id.* ¶ 62.)[5] Specifically, monthly monitoring reports regarding plaintiff's performance and the "Team Pazmino" record show that plaintiff failed to meet the Average Handle Time objective in March, May, June, September, and October 2007,

the Offer Rate objective in February and October 2007, and the Availability objective in June and October 2007. (*Id.* ¶ 63.) Plaintiff's failure to meet her objectives that number of times warranted a First Written Warning. (*Id.* ¶ 64.)

CAF has an Attendance and Lateness Policy and, in August 2007, issued a revised version of its "Standards for Attendance and Late Arrival/Early Departure." (*Id.* ¶ 65.) Under these standards, a Written Warning is also warranted if a part-time employee has four unscheduled absences during a twelve-month period. (*Id.* ¶ 67.) According to plaintiff's Record of Absence for 2007, plaintiff had five instances of unscheduled absences, covering eight days, during 2007.[6] (*Id.* ¶ 68.) Under the standards, a Written Warning is warranted if a part-time employee has six unscheduled late arrivals or early departures during a twelve-month period. (*Id.* ¶ 69.) According to plaintiff's Record of Punctuality for 2007, plaintiff had eight instances of unscheduled late arrivals and/or early departures during 2007. (*Id.* ¶ 70.) In accordance with the Bank's Corrective Action Policy, plaintiff received a Written Warning in November 2007 based upon her failure to satisfy the CSR performance objectives, and her unscheduled absenteeism/late arrivals/early departures. (*Id.* ¶ 73.)[7]

---

[3] Plaintiff "cannot say with certainty" that these documents were "given at all to any of the CAF 'new hires.'" (Pl.'s 56.1 ¶ 34.)

[4] In June 2007, CAF distributed new versions of the Guidelines and Standards. (Def.'s 56.1 ¶ 60.) The June 2007 Guidelines and Standards adjusted some of the performance standards, but did not change the metrics for determining whether corrective action was warranted. (*Id.* ¶ 61.)

[5] Plaintiff asserts that this statement is "misleading by not stating that some of the occurrences happened in the Plaintiff's transitional phase of employment and would not be uncommon to receive." (Pl.'s 56.1 ¶ 38.)

[6] According to the Dorritie Reply Declaration, plaintiff had six instances of unscheduled absences, covering eight days, during 2007. (Dorritie Reply Declaration ("Dorritie Reply Decl.") at ¶ 7, July 15, 2011, ECF No. 37.) Whether plaintiff had five or six instances of unscheduled absences is not dispositive of this motion in light of plaintiff's numerous other underperformance and attendance issues.

[7] Plaintiff asserts that she did not accept the November 2007 "error riddled Written Warning" because many of the documents used to determine the Written Warning were "filled with errors and not fixed." (Pl.'s 56.1 ¶¶ 49-50.)

Plaintiff's performance for 2007 was rated as "Meets Expectations." (*Id.* ¶ 75.) Plaintiff's supervisor at the time, Brett Mounsey ("Mounsey"), expressed some concerns regarding plaintiff's job performance. (*Id.* ¶ 76.)

D.     Alleged Acts of Discrimination

Plaintiff claims that "she was discriminated against by the defendant because of her race." (*Id.* ¶ 77.) Specifically, plaintiff claims that she was unfairly disciplined because the "entire team that I was hired w/ in Nov 06 were written up within days of each other all minorities." (*Id.* ¶ 78.) Of the 17 CSRs hired along with the plaintiff in November 2006, four were Asian, one was Hispanic/Latino, three were White, seven were Black/African American, and two were not specified. (*Id.* ¶ 80.) Eleven[8] of these 17 CSRs resigned prior to November 2007 for a variety of reasons, including all three of the White CSRs. (Dorritie Reply Declaration ("Dorritie Reply Decl.") at ¶ 3, July 15, 2011, ECF No. 37.) Of the six remaining CSRs, only four received Written Warnings in November 2007, two of whom were Black, one was Hispanic/Latino, and one was Asian.[9] (*Id.* ¶ 4.) Of the two CSRs who did not receive Written Warnings in November 2007, one was Black and one was Asian. (*Id.*)

Neal was "put on a two-month restricted warning." (Def.'s 56.1 ¶ 83.) After plaintiff received her Written Warning, she complained that it overstated the number of times she failed to meet the performance objectives and the number of times she had unscheduled absences from work. (*Id.* ¶ 84.)

E.     Alleged Acts of Retaliation

Plaintiff claims that, after she filed a Charge of Discrimination with the EEOC on January 7, 2008, she was retaliated against for filing that charge. (*Id.* ¶¶ 88-89.) She claims that on the day she filed her first charge – January 7, 2008 – she openly discussed her charge, and then was transferred to another team. (*Id.* ¶ 89.) Defendant contends that plaintiff was transferred from Zaira Pazmino's ("Pazmino") team to Mounsey's team in January 2008 because Pazmino had gone on a leave of absence, as a result of which her entire team was transferred to different supervisors. (*Id.* ¶ 90.) Plaintiff asserts, however, that she was the only one transferred from Pazmino's team to Mounsey's team, and that no one else was transferred for any leave of absence. (Pl.'s 56.1 ¶ 67.) CAF did not receive a copy of plaintiff's charge from the EEOC until weeks later and, therefore, did not have confirmation that Neal filed a charge until that time. (Def.'s 56.1 ¶ 92.)[10]

Plaintiff asserts that her evaluation was extremely negative and not reflective of her

---

[8] According to Defendant's 56.1 Statement, ten of the CSRs resigned, and seven remained. (Def.'s 56.1 ¶ 81.) Plaintiff states that she has organization charts to show that, by October 2007, "only six of the CSRs hired in November 2007 remained in CAF." (Pl.'s 56.1 ¶ 58.) Given that the Dorritie Reply Declaration states that six CSRs remained, it appears that defendant and plaintiff agree that only six CSRs remained in November 2007.

[9] Plaintiff states that the four employees who remained on Pamela Copeland's team and then switched in October 2007 to Pazmino's team "were all written up." (Pl.'s 56.1 ¶ 58.) The two who were transferred to Copeland's new team were "not written up and were held to a different criteria." (*Id.*)

[10] Plaintiff contends that she "openly discussed her filing of EEOC charges on the call center floor." (Pl.'s 56.1 ¶ 68.) She further states that she "spoke to at least one supervisor that she recalls before the charge was placed with EEOC," (Pl.'s Opp. ¶ 34.), and defendant has included a declaration from Dorritie in which she admits that "Neal may have made a general statement to me at some time that she was going to file a charge." (Dorritie Decl. ¶ 34, Mar. 21, 2011, ECF No. 24.)

achievements. (*Id.* ¶ 93.) Although plaintiff received a "Meets Expectation" rating, she was given comments such as: "Work on approaching work and challenges with a positive view"; "Bernadette needs to work on doing things without being told"; "Bernadette should continue to work on her written and verbal communication skills"; "At times, Bernadette has expressed views and has demonstrated approaches that may be discouraging and de-motivating to others"; "I would like to see Bernadette establish effective working relationships. When asked to do something by management, Bernadette should try to act quickly and with enthusiasm, attracting the favorable attention from superiors." (*Id.* ¶ 94; Pl.'s 56.1 ¶ 70.)

Plaintiff also asserts that she was entitled to a pay raise that she did not receive. (Def.'s 56.1 ¶ 95.) At the Bank, any increase is always a matter of management discretion, regardless of an employee's performance rating. (*Id.* ¶ 96.) Since a Meets Expectation rating covers 70% of the applicable employee population, it is not unusual for some employees to receive a "Meets" rating, but not receive any salary increase. (*Id.* ¶ 97.)

Plaintiff also contends that she was met with problems every time she tried to take a day of using FMLA leave. (*Id.* ¶ 98.) Specifically, plaintiff asserts that her supervisor, Mounsey, changed days from "scheduled" to "unscheduled," even though all FMLA absences are supposed to be "scheduled." (Pl.'s 56.1 ¶ 75.) When using any of her approved intermittent FMLA time, plaintiff was required to specify that she was taking an FMLA day in order for CAF to record it that way. (Def.'s 56.1 ¶ 99.) When plaintiff met with Dorritie to discuss her Written Warning, Dorritie removed October 1, 2007 – one of the days listed as an unscheduled absence – because

it should have been listed as an FMLA day. (*Id.* ¶ 100.) Plaintiff contends that neither her Punctuality and Absence Chart nor her Written Warning were corrected to reflect the removal of October 1, 2007. (Pl.'s 56.1 ¶ 76.) Dorritie does not recall that any of the other days left on the Written Warning were still in question, but plaintiff asserts that she advised Dorritie that June 7, 2007 and June 8, 2007 were in dispute and should have been approved FMLA absences. (Def.'s 56.1 ¶ 101, Pl.'s 56.1 ¶ 77.)

Plaintiff's final allegation of retaliation is that she had five supervisors in less than two years. (Def.'s 56.1 ¶ 102; Pl.'s 56.1 ¶ 78.) The CAF Customer Service Department in Garden City had reorganized several times in 2007 and 2008 due to changing economic times and, during 2008, the Department had been downsizing as it transitioned to its closure by year-end. (Def.'s 56.1 ¶ 103.) Pamela Copeland ("Copeland"), who is Black, was plaintiff's supervisor from January 2007[11] through October 2007. (*Id.* ¶ 104.) Because Copeland was out a number of times during 2007, Copeland's team was moved to Pazmino, who is Hispanic. (*Id.* ¶ 105.) In January 2008, Pazmino went on a leave of absence, so her entire team, including plaintiff, was transferred to different supervisors. (*Id.* ¶ 106.) Plaintiff states that she does not remember Pazmino going on a leave of absence and asserts that she, plaintiff, was the only person moved. (Pl.'s 56.1 ¶ 80.) Next, plaintiff was reassigned to Mounsey, a White female, because plaintiff "had made a point" that she frequently did not have a supervisor available because she worked from 4:00 p.m. to 8:00 p.m. and Mounsey worked later in the evening.

---

[11] Plaintiff states that Copeland was plaintiff's supervisor beginning in November 2006. (Pl.'s 56.1 ¶ 79.)

(Def.'s 56.1 ¶ 107.)[12] Mounsey obtained a new position in a different department in April 2008 and was replaced by Jennifer Martinez, who is White. (*Id.* ¶ 108.) Martinez went on a leave of absence and plaintiff was reassigned to Tania Sanchez from June 2008 to November 2008. (*Id.* ¶ 109.) Defendant contends that the majority of other employees in the Department, including similarly situated White employees, were also reassigned in order to meet business needs. (*Id.* ¶ 111.) Plaintiff asserts that all of the CAF CSRs "from the months of October 2007 through February 2008" remained on their assigned team, other than Neal. (Pl.'s 56.1 ¶ 83.)

F.     Pay Statements

Plaintiff states that she "discovered in March 2009 that someone from JPMorgan Chase falsified her 2007 payroll" by changing the pay periods to make it appear as if she worked full-time. (*Id.* ¶ 84.) In her Reply Declaration, Kathleen M. Hartmann ("Hartmann"), Vice President and Payroll Manager in the Payroll Management group, explains that she reviewed Neal's 2007 pay statements and found them to be correct. (Hartmann Reply Declaration ("Hartmann Reply Decl.") at ¶ 4, July 20, 2011, ECF No. 38.) Dorritie then sent Hartmann copies of the records that Neal had received in 2009, and Hartmann found that they were different than the 2007 records, by multiples of her actual pay. (*Id.* ¶ 5.) Hartmann attempted to reprint the inaccurate records Neal had received in 2009, but was unable to do so, and believes that a system disruption caused the issue in the records Neal received. (*Id.* ¶ 6.) Hartmann then reviewed Neal's W-2 statement for 2007 and found that it accurately set forth plaintiff's compensation

for 2007, as well as the withholdings from that compensation. (*Id.* ¶ 7.)

II.     PROCEDURAL HISTORY

Defendant removed the case from New York State Supreme Court, Queens County, on March 15, 2010 based on diversity of citizenship jurisdiction. On March 21, 2011, defendant filed a motion for summary judgment. Plaintiff filed an opposition to the motion for summary judgment, dated May 19, 2011. Plaintiff then submitted her Rule 56.1 Statement, which was dated June 13, 2011. On July 22, 2011, defendant filed a reply in support of its motion for summary judgment, along with three reply declarations. On December 19, 2011, the Court held a telephone conference to discuss whether defendant had served the *pro se* notice for summary judgment under Local Rule 56.2 and to address the reply declarations. On December 19, 2011, defendant re-filed its motion for summary judgment, enclosing the *pro se* notice under Local Rule 56.2. Plaintiff filed a response to the reply declarations, dated January 30, 2012. On February 14, 2012, defendant filed sur-reply declarations.[13] The Court has fully considered the parties' submissions.

III.     STANDARD OF REVIEW

The standards for summary judgment are well settled. Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).   The moving party bears the burden of showing that he or

---

[12] Plaintiff notes that other co-workers were not moved for their "convenience." (Pl.'s 56.1 ¶ 81.)

[13] Because plaintiff has not had an opportunity to respond to the defendant's sur-reply declarations, and because they are not necessary for the Court to address the motion, the Court has not considered or relied on them in reaching this decision.

she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)). As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted). Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original). Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir. 1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g.*, *Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil

8

that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys*., 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## IV. DISCUSSION

Plaintiff asserts that she has been discriminated against based on her race in violation of Title VII and that she has been subjected to retaliation in violation of Title VII for engaging in protected activity. Defendant argues that (1) the action should be dismissed because plaintiff entered into a valid agreement with the Bank when she was terminated accepting the Bank's offer of severance benefits in return for releasing the Bank from any claims plaintiff had against it; (2) most, if not all, of the actions plaintiff complains about were not adverse employment actions; (3) the Bank articulated legitimate non-discriminatory reasons for its actions regarding plaintiff; (4) plaintiff has produced no evidence to show that the Bank's reasons for its actions regarding her were a pretext for racial discrimination; and (5) plaintiff cannot prove that defendant retaliated against her.

For the reasons set forth below, defendant's motion is granted.

### A.    The Release

Defendant argues that summary judgment should be granted in its favor on all claims because the plaintiff knowingly and voluntarily signed a Release Agreement barring her from pursuing any legal claims. For the reasons set forth below, the Court agrees.

### 1.    Applicable Law

"New York law provides that this Court must enforce contract provisions clearly expressing the intent of the parties." *Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 580 (2d Cir. 2006) (citing *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 750 N.Y.S.2d 565 (2002) ("[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.")). "A plaintiff may waive a statutory claim for discrimination as long as it is done knowingly and voluntarily." *Shain v. Ctr. for Jewish History*, No. 04-CV-1762 (NRB), 2006 U.S. Dist. LEXIS 89056, at *8 (S.D.N.Y. Dec. 8, 2006) (citing *Bormann v. AT&T Commc'ns, Inc.*, 875 F.2d 399, 402 (2d Cir. 1989) (dismissing ADEA claims), *superseded by statute*, Older Workers Benefits Protection Act, 29 U.S.C. § 626(f), *as recognized in Am. Airlines, Inc. v. Cardoza-Rodriguez*, 133 F.3d 111, 117 (1st Cir. 1998)); *Branker v. Pfizer, Inc.*, 981 F. Supp. 862, 865-66 (S.D.N.Y. 1997) (dismissing NYSHRL claims)).

In determining whether a waiver was "knowing and voluntary," a totality of the circumstances test is applied. *Branker*, 981 F. Supp. at 865-66 (citing *Bormann*, 875 F.2d at 403); *Livingston v. Adirondack Beverage Co.*, 141 F.3d 434, 437-38 (2d Cir. 1998). Factors to be considered include: "(1) the plaintiff's education and business experience, (2) the amount of time the plaintiff had possession of or access to the agreement before signing it, (3) the role of plaintiff in deciding the terms of the agreement, (4) the clarity of the agreement, (5) whether the plaintiff was represented by or consulted with an attorney, and (6) whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by

contract or law." *Bormann*, 875 F.2d at 403 (quotations and citation omitted); *accord Livingston*, 141 F.3d at 438. The *Bormann* factors are not exhaustive and not every factor must be in defendant's favor for the release to be found knowing and voluntary; rather, all of the factors must be examined under the totality of the circumstances. *See Bormann*, 875 F.2d at 403; *Laniok v. Advisory Comm. of Brainerd Mfg. Co. Pension Plan*, 935 F.2d 1360, 1368 (2d Cir. 1991); *see also Hernandez v. Philip Morris USA, Inc.*, 486 F.3d 1, 10 (1st Cir. 2007) ("That one of the six factors tends to favor the appellants is not enough to tip the summary judgment balance; the law is clear that no single factor is determinative in evaluating whether a waiver is knowing and voluntary. It is sufficient to sustain the validity of a release and the enforceability of its terms, at the summary judgment stage, that the relevant circumstances point unerringly toward that result.") (internal citation omitted); *accord Nicholas v. NYNEX, Inc.*, 929 F. Supp. 727, 732 (S.D.N.Y. 1996). Moreover, under New York law, which applies a lesser standard, "a release need only be clear, unambiguous, and knowingly and voluntarily entered into." *Shain*, 2006 U.S. Dist. LEXIS 89056, at *9 (citing *Nicholas*, 929 F. Supp. at 732); *accord Goode v. Drew Bldg. Supply, Inc.*, 266 A.D.2d 925, 925, 697 N.Y.S.2d 417, 417-18 (N.Y. App. Div. 1999) ("We reject the contention that the validity of that release is to be determined in accordance with . . . the totality of the circumstances standard applicable to Federal discrimination claims." (citations omitted)).

## 2.    Application

The first factor, plaintiff's education and business experience, supports a finding that she knowingly and voluntarily signed the Release Agreement. Plaintiff attended and graduated with honors from Andrew Jackson High School in 1988. (Def.'s 56.1 ¶¶ 1-2.) She attended Long Island University ("LIU") on a full-time basis from 1999 until 2001. (*Id.* ¶ 3; Pl.'s 56.1 ¶ 3.) While at LIU, Neal took more than 48 credits towards a major in Finance in such areas as "accounting, finance, law, business [and] marketing," and was on the Dean's List. (Def.'s 56.1 ¶ 4.) Furthermore, Neal worked in the insurance and financial services industry for several years and had held at least one supervisory position. (*Id.* ¶¶ 6-13.) Neal's level of experience and knowledge, therefore, weighs in favor of validity. *See Reid v. IBM*, 95 Civ. 1755 (MBM), 1997 U.S. Dist. LEXIS 8905, *16-17 (S.D.N.Y. June 26, 1997) ("plaintiff's education and business experience – business studies in high school and community college, and 10 years of managerial experience at IBM – is sufficient to warrant the inference that he understood the Release"); *Nicholas.*, 929 F. Supp. at 731 (high school graduate who had completed subsequent training in computer programming and occupied a management position was capable of understanding release).

The second factor, the amount of time the plaintiff had possession of or access to the agreement before signing it, also supports a finding that plaintiff signed the Release knowingly and voluntarily. On October 3, 2008, Dorritie provided Neal with formal written notice that her position would be eliminated and her employment terminated as of December 1, 2008. (Def.'s 56.1 ¶ 30; Pl.'s 56.1 ¶ 27.) The notice letter offered Neal four weeks of severance pay if she did not obtain another position with JPMorgan Chase during that period, on condition that Neal execute a proposed Release Agreement. (Def.'s 56.1 ¶ 32.) The letter gave plaintiff forty-five days, or until November 17, 2008, to execute and return the agreement in order to agree to its benefits.    (*Id.* ¶¶ 34-35; Def.'s Ex. 6.)

Plaintiff contends that defendant sought to have the agreement signed by close of business on November 5, 2008 instead of November 17, 2008. (Pl.'s 56.1 ¶ 29.) Construing the facts in the light most favorable to plaintiff and assuming that she was given only until November 5, 2008, she had thirty-three days in which to execute and sign the release. That plaintiff had thirty-three days to execute the release supports a finding that plaintiff knowingly and voluntarily signed the Release. *See Shain*, 2006 U.S. Dist. LEXIS 89056, at *11 (several hours sufficient); *Laramee v. Jewish Guild for the Blind*, 72 F. Supp. 2d 357, 360 (S.D.N.Y. 1999) (less than one month sufficient); *Dewey v. PTT Telecom Neth., U.S.*, 94 Civ. 5983 (HB), 1995 U.S. Dist. LEXIS 13134, at *5-6 (S.D.N.Y. Sept. 11, 1995), *aff'd* 101 F.3d 1392 (2d Cir. 1996) (four days sufficient).

The fourth factor, the clarity of the agreement, supports a finding that plaintiff knowingly and voluntarily signed a Release agreement that she fully understood. The Release Agreement includes the following relevant language: "I hereby release JPMorgan Chase & Co. . . . from all liability for any claims or potential claims relating to my employment with the Company and/or the termination of my employment, subject to the exceptions listed below. I understand that 'claims' includes claims I know about and claims I do not know about, as well as the continuing effects of anything that happened before I sign below." (Def.'s Mot. for Summary Judgment, Ex. 7.) The Release lists some of the claims that are covered by the Release, including claims under Title VII of the Civil Rights Act of 1964 and claims of retaliation. (*Id.*) The Release further states, "I agree that I will not file a lawsuit or initiate any other legal proceedings for money or other relief in connection with the claims I am releasing above." (*Id.*) Finally, the Release states, "By

signing below, I confirm that I have read this Release, understand it, agree to it and sign it knowingly and voluntarily. I agree that I am signing this Release in exchange for benefits to which I would not otherwise be entitled." (*Id.*) Under the line, "Intending to be legally bound, I, Bernadette Neal, hereby sign the foregoing Release this 4th day of November, 2008," Neal signed the form and had it notarized. (*Id.*) The language makes clear that the signatory releases the Bank from "all liability for any claims" relating to employment with the Bank. The language throughout the Release Agreement is straightforward, clear, and repeatedly conveys that the consequence of signing is the release of all claims against the Bank. Accordingly, this factor weighs in favor of validity. *See Shain* 2006 U.S. Dist. LEXIS 89056, at *10; *Dewey*, 1995 U.S. Dist. LEXIS 13134, at *6 ("The Release signed by Dewey is unambiguous. It is less than two typewritten pages, written in clear and simple language, and releases all 'actions, suits . . . claims and demands' against [the employer] 'including, without limitation, any and all claims arising out of or in connection with [Dewey's] employment.'").

Finally, the sixth factor, whether the consideration given in exchange for the waiver exceeds employee benefits to which the employee was already entitled by contract or law, weighs in favor of validity, since Neal had no other right to any severance benefits. (Def.'s 56.1 ¶ 33.) *See Dewey*, 1995 U.S. Dist. LEXIS 13134, at *6 ("In exchange for executing the Release, Dewey received one month's salary, employee benefits and other benefits, even though Dewey's employment contract did not entitle her to any compensation for resigning.").

Two of the eight factors weigh against a finding of validity: the role of plaintiff in

deciding the terms of the agreement and whether the plaintiff was represented by or consulted with an attorney. In *Shain*, however, the court held that, although these two factors weighed against validity, on balance, the release was valid. 2006 U.S. Dist. LEXIS 89056, at *11-14. In *Shain*, the plaintiff was "told that the terms of the release were non-negotiable" and "was not represented by counsel, did not otherwise consult with counsel, and was not encouraged by the [employer] to do so." *Id.* at *12. Nonetheless, the plaintiff "was not discouraged from seeking counsel, and could have done so had she wished." *Id.* Furthermore, plaintiff could not "argue that counsel was needed to enable her to understand the straightforward language of the release." *Id.* This Court agrees with the analysis in *Shain* and concludes that the same result is warranted here. In the instant action, plaintiff was not given an opportunity to negotiate the terms of the release, nor was she represented by counsel, but she was encouraged by defendant to consult an attorney regarding the proposed Release Agreement. (Def.'s 56.1 ¶¶ 34-35.) Notably, in *Bormann*, the Second Circuit relied on an additional two factors in its "totality of the circumstances" inquiry – "whether [the] employer encourage[d] or discourage[d] [the] employee to consult an attorney" and "whether the employee had a fair opportunity to do so." 875 F.2d at 403. In this case, both of these factors favor the defendant. Although Neal was encouraged to consult an attorney and had a fair opportunity to do so, she chose not to consult one. (Def.'s 56.1 ¶ 37.) Moreover, she did not ask any questions about the Release Agreement of a CAF representative. (*Id.* ¶ 38.) Thus, although plaintiff had no role in deciding the terms of the agreement and was not represented by an attorney, she was encouraged to consult an attorney and had a fair opportunity to do so. Evaluating

the totality of the circumstances, therefore, the fact that plaintiff could not negotiate the terms of the agreement and was not represented by an attorney does not outweigh all of the other factors that overwhelmingly support a finding that she knowingly and voluntarily entered into the agreement. *See also Laramee*, 72 F. Supp. 2d at 360 ("even assuming as true [plaintiff's] allegation that she did not have an opportunity to negotiate the terms of the release, the absence of this factor alone does not create an issue of fact as to voluntariness.")

Plaintiff makes three additional arguments concerning the validity of the release, all of which the Court finds to be unpersuasive. First, she contends that Dorritie, the head of Human Resources, was aware that plaintiff had brought an EEOC charge at the time she made plaintiff's severance package, yet nothing in the severance package or release referenced the open EEOC charge. (Pl.'s 56.1 ¶¶ 28, 30.) However, the EEOC takes the position that releases and waivers of claims cannot restrict an employee's right to file a charge with the EEOC or to take part in EEOC proceedings.[14] Defendant, therefore, properly did not include any reference to plaintiff's pending EEOC charges in the release. In any event, defendant does not contend that plaintiff was barred from proceeding with her EEOC charges – just with the instant lawsuit. This argument,

---

[14] *See* EEOC, Understanding Waivers of Discrimination Claims in Employee Severance Agreements, *available at* http://www.eeoc.gov/policy/docs/qanda_severance-agreements.html#12. ("Although most signed waivers are enforceable if they meet certain contract principles and statutory requirements, an employer cannot lawfully limit your right to testify, assist, or participate in an investigation, hearing, or proceeding conducted by the EEOC or prevent you from filing a charge of discrimination with the agency.").

therefore, has no bearing on the validity of the release.

Second, plaintiff asserts that the defendant initially rejected the agreement because plaintiff failed to have a notary provide a "raised seal" on the agreement. (Pl.'s 56.1 ¶ 29.) If anything, this assertion weighs in favor of validity because the defendant was reluctant to accept a hastily signed agreement that was improperly notarized. Instead, the defendant insisted that plaintiff take the time to properly notarize the agreement.

Third, plaintiff argues that she signed the release under duress because she needed the severance payment. Plaintiff's financial condition is insufficient to constitute duress. *See Mazurkiewicz v. N.Y. City Health & Hosps. Corp.*, 585 F. Supp. 2d 491, 500 (S.D.N.Y. 2008) ("[T]o make out a claim of economic duress, a plaintiff must establish that the agreement was obtained: (1) by means of wrongful threat precluding the exercise of free will; (2) under the press of financial circumstances; (3) where circumstances permitted no other alternative. In other words, the duress (the threat) must emanate from the party who is attempting to obtain the agreement." (internal quotations and citations omitted)). Here, plaintiff does not argue that defendants made any wrongful threat precluding the exercise of free will.[15] Thus, the uncontroverted facts show that plaintiff did not sign the release under duress.

---

[15] Additionally, a release induced by duress "'is voidable,' rather than void; therefore, 'the person claiming duress must act promptly to repudiate the contract or release or he will be deemed to have waived his right to do so.'" *Nasik Breeding & Research Farm Ltd. v. Merck & Co.*, 165 F. Supp. 2d 514, 527-28 (S.D.N.Y. 2001) (quoting *VKK Corp. v. NFL*, 244 F.3d 114, 122 (2d Cir. 2001)). Plaintiff has not repudiated the contract.

Accordingly, the uncontroverted facts demonstrate that, under the totality of the circumstances test, plaintiff signed the Release Agreement with the Bank voluntarily and knowingly, and therefore released, *inter alia*, all of the claims she asserts in this action.[16] In an abundance of caution, however, the Court will address the merits of Neal's discrimination and retaliation claims.

## B. Neal's Title VII Claim of Racial Discrimination

Plaintiff asserts that she was discriminated against because she did not receive appropriate training and coaching and then received a Written Warning, and all of plaintiff's team, who were minorities, were written up by their new supervisor. Additionally, plaintiff asserts that Human Resources failed to correct errors in plaintiff's work record concerning her use of FMLA leave. Defendant argues that these actions do not constitute adverse employment actions. Defendant further argues that it has articulated a legitimate non-discriminatory reason for its actions regarding the plaintiff, and plaintiff has produced no evidence to show that the Bank's reasons for its actions were pretextual. The Court concludes, for the reasons set forth below, that no rational jury

---

[16] "It is well settled that the totality-of-the-circumstances standard is stricter than ordinary contract law principles for determining whether a release is knowing and voluntary." *Cordoba v. Beau Deitl & Assocs.*, 02 Civ. 4951 (MBM), 2003 U.S. Dist. LEXIS 22033, at *20 (S.D.N.Y. Dec. 8, 2003) (citing *Bormann*, 875 F.2d at 403)). Thus, since Neal's waiver of her Title VII claims was knowing and voluntary under federal law under the totality-of-the-circumstances test, for the reasons discussed *supra*, it was knowing and voluntary under New York law. Accordingly, liberally construing the plaintiff's complaint to raise both federal and state discrimination and retaliation claims, the Court grants summary judgment on the state law claims for all the same reasons it is warranted on the federal claims.

could find that any of these acts were racially motivated.

### 1.    Applicable Law

Title VII prohibits discrimination of an employee based on her race. *See* 42 U.S.C. § 2000e-2(a). Here, plaintiff claims she has been discriminated against by defendant on the basis of her race.

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met his burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000); *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997). In the absence of direct evidence of discrimination, a plaintiff in an employment discrimination case usually relies on the three-step *McDonnell Douglas* test. First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected class, (2) who performed his job satisfactorily, (3) but suffered an adverse employment action, (4) under circumstances giving rise to an inference of discrimination (or retaliation). *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 & n.13 (1973) (noting that elements of *prima facie* case vary depending on factual circumstances); *see also Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The

purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc) *abrogated on other grounds by Reves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097 (2000).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an

inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2.   Application

Assuming *arguendo* that plaintiff has established a *prima facie* case of discrimination,[17] the uncontroverted facts demonstrate that defendant has articulated a nondiscriminatory reason for its actions, and plaintiff has failed to meet her burden to produce evidence from which a rational jury could find that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason.

First, plaintiff alleges that she did not receive appropriate training and coaching and then received a Written Warning, which

she contends was issued to her because of her race. She claims that the members of her team, all of whom were minorities, received Written Warnings at the same time from their new supervisor. As an initial matter, plaintiff asserts that the Written Warning was not warranted. However, although plaintiff disputes a number of the findings with respect to her underperformance and attendance issues, there are several incidents for which she has no explanation. For example, the defendant explains that plaintiff received a Written Warning because she failed to meet the business objectives standards at least 9 times in a rolling 12-month period through October 2007. (Def.'s 56.1 ¶¶ 62, 64.) Specifically, plaintiff failed to meet the Average Handle Time objective in March, May, June, September, and October 2007, the Offer Rate objective in February and October 2007, and the Availability objective in June and October 2007. (*Id.* ¶ 63.) Plaintiff counters that: (1) some of the occurrences happened during plaintiff's transitional phase of employment and "would not be uncommon to receive"; (2) incoming call flow could cause lower scores; (3) plaintiff met her Availability objective in April 2007 and March 2007 and her Offer Rate objective in March 2007; and (4) in October, plaintiff was removed from her usual lines of call queues and put on a slower line. (Pl.'s 56.1 ¶¶ 38-40.) Even accepting plaintiff's explanations as true, she has not contested the specific incidents defendant points to.[18]

---

[17] Defendant argues that most, if not all, of the actions about which plaintiff complains were not adverse employment actions. (Def.'s Mem. of Law in Support of Mot. for Summary Judgment ("Def.'s Mot.") at 18-20, Mar. 21, 2011, ECF No. 27.) Because the uncontroverted evidence demonstrates that defendant has articulated legitimate non-discriminatory reasons for its actions and plaintiff has failed to provide evidence from which a rational jury could find that the employer's decision was motivated, at least in part, by a discriminatory reason, the Court has not addressed whether the alleged acts constitute adverse employment actions.

[18] Plaintiff generally asserts that there were "mistakes" throughout the monthly monitoring system that had plaintiff "month after month not meeting her goals when she actually met and exceeded many." (Pl.'s 56.1 ¶ 46.) Notwithstanding this claim, which is unsupported by any additional evidence, defendant does not argue that plaintiff failed to meet or exceed many goals. Instead, defendant points to specific instances of

Furthermore, plaintiff received the Written Warning because of her unscheduled absences and instances of tardiness. A Written Warning is warranted if a part-time employee has four unscheduled absences during a twelve-month period. (Def.'s 56.1 ¶ 67.) A Written Warning is also warranted if a part-time employee has six unscheduled late arrivals or early departures during a twelve-month period. (*Id.* ¶ 69.)

Plaintiff had five instances of unscheduled absences, covering eight days, during 2007. (*Id.* ¶ 68.) Plaintiff asserts that she disputed three of the absences: June 7-8, 2007 and October 1, 2007. (Pl.'s 56.1 ¶ 42.) Plaintiff asserts that the June 7-8, 2007 absence was for a chronic condition. (*Id.* ¶ 43.) She further explains that the October 1, 2007 was approved under the FMLA, but was "still used against the employee for corrective action." (*Id.*) With respect to tardiness, plaintiff had eight instances of unscheduled late arrivals and/or early departures during 2007. (Def.'s 56.1 ¶ 70.) Plaintiff asserts that her lateness on August 26, 2007 was due to the fact that "she had just come back from vacation and had a school project to complete," and therefore the supervisor should have permitted her to sign for those hours as approved vacation time. (Pl.'s 56.1 ¶ 44.) Plaintiff's explanation for her lateness does not change the fact that she was late on that day. As for the absences, even assuming, *arguendo*, that defendant incorrectly counted the June 7-8, 2007 and October 1, 2007 absences as unscheduled, the Written Warning would still have been warranted for all of the other performance and tardiness issues described above.

In any event, even assuming that defendant's investigation into plaintiff's underperformance was sloppy or incomplete, plaintiff has provided no evidence that it was racially motivated. In fact, it is uncontroverted that the whole CSR team was not given warnings. The 17-member CSR team hired in November 2006 was composed of four Asians, one Hispanic/Latino, three Whites, seven Black/African Americans, and two who did not specify their race. By November 2007, eleven members, including all three of the White CSRs, were no longer in those positions at the Bank. Of the six remaining CSRs, only four received Written Warnings in November 2007, two of whom were Black, one was Hispanic/Latino, and one was Asian. The two CSRs who did not receive Written Warnings were Black and Asian. Thus, non-Black CSRs received Written Warnings, and one Black person did *not* receive a Written Warning. Accordingly, no rational jury could conclude, based on this evidence, that defendant's action in giving plaintiff a Written Warning was motivated by discriminatory animus.

Second, plaintiff asserts that Human Resources failed to correct errors in plaintiff's work record concerning her use of FMLA leave.[19] Plaintiff's disagreements

---

underperformance and attendance issues that, under the Bank's policies, resulted in a Written Warning.

---

[19] Plaintiff argued that October 1, 2007 should have been counted as a "scheduled" FMLA absence. Defendant subsequently changed October 1, 2007 to a scheduled FMLA absence, but plaintiff argues that her Written Warning was not altered to reflect this change. Defendant explains, however, that the Bank's Disability Management Services did not approve October 1, 2007 for FMLA leave until November 9, 2007, one day after plaintiff was issued the November 8, 2007 Written Warning. (Dorritie Reply Decl. at ¶ 12.) Accordingly, the Written Warning properly included October 1, 2007. Even excluding October 1, 2007, though, plaintiff still had enough unscheduled absences to warrant a warning. In any event, once the approval for FMLA leave came through, Dorritie made clear that October 1, 2007 was no longer included as an unscheduled absence.

with the decision to deny her FMLA application for the June 7 and June 8, 2007 absences, and to count certain disputed instances in which she failed to meet her performance objectives, do not provide an inference of discriminatory animus or pretext.[20]

Thus, the uncontroverted facts demonstrate that defendant has articulated a nondiscriminatory reason for its actions in giving plaintiff a Written Warning and in its handling of plaintiff's contested FMLA leave, and plaintiff has failed to meet her burden to show, even construing the evidence most favorably to plaintiff, that a rational jury could find that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason.

C. Neal's Title VII Claim of Retaliation

Plaintiff argues that the Bank retaliated against her after she filed an EEOC discrimination charge on January 7, 2008 against the Bank by: (1) giving her a negative performance evaluation and denying her a salary increase in 2008; (2) transferring her to five different supervisors

in two years; (3) providing her with fraudulent pay statements in 2009; and (4) making it difficult for her to take FMLA leave. (Pl.'s Opposition ("Pl.'s Opp.") at ¶¶ 6, 33, May 19, 2011, ECF No. 52.) Defendant counters that (1) plaintiff has not demonstrated that the actual decision-makers knew that plaintiff had filed a charge of discrimination with the EEOC,[21] and (2) plaintiff has not demonstrated that the Bank took those actions in retaliation for the earlier filing of the EEOC charge. The Court concludes, for the reasons set forth below, that no rational jury could find that any of the acts were retaliation for plaintiff filing an EEOC complaint.

1.  Legal Standard

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).

The Court evaluates a Title VII retaliation claim under the three-step, burden-shifting framework used for an adverse employment claim, as established by *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973).  First, a plaintiff must establish a *prima facie* case of retaliation by demonstrating that "(1) the employee was

---

(*Id.*) Plaintiff further asserts that she advised Dorritie that June 7, 2007 and June 8, 2007 were in dispute and should have been approved as an FMLA absence. Dorritie explains that these days were never approved by Disability Management Services for FMLA leave because the absences were not submitted by plaintiff's health care provider as a chronic condition. (*Id.* ¶ 11.)

[20] Plaintiff also alleges that she had five different supervisors in less than two years, whereas no White workers were moved around; that she did not receive a raise; and that defendant falsified plaintiff's payroll to make plaintiff appear to earn a full-time wage. It appears that these acts are alleged as acts of retaliation (and addressed accordingly, *infra*), rather than as acts of discrimination. Even assuming that plaintiff is attempting to make them grounds for discrimination, there is no evidence from which a rational jury could conclude that any of these actions were motivated by discriminatory animus.

[21] Plaintiff states that she "spoke to at least one supervisor that she recalls before the charge was placed with EEOC," (Pl.'s Opp. ¶ 34.), and defendant has included a declaration from Dorritie in which she admits that "Neal may have made a general statement to me at some time that she was going to file a charge." (Dorritie Decl. ¶ 34.) Because the Court holds that no rational jury could conclude that any of the acts were retaliation for plaintiff filing an EEOC complaint, the Court does not address the issue of whether the actual decision-makers knew that plaintiff had filed a charge of discrimination with the EEOC.

engaged in protected activity; (2) the employer was aware of that activity; (3) the employee suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action." *Gregory v. Daly*, 243 F.3d 687, 700 (2d Cir. 2001) (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996)). The term "protected activity" refers to action taken to protest or oppose statutorily prohibited discrimination. *See* 42 U.S.C. § 2000e-3; *see also Wimmer v. Suffolk County Police Dep't*, 176 F.3d 125, 134-35 (2d Cir. 1999). Informal as well as formal complaints constitute protected activity. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990). Title VII protects not only those employees who opposed employment practices made unlawful by the statute but also those who have "a good faith, reasonable belief that the underlying challenged actions of the employer violated the law" even if those actions did not. *McMenemy v. City of Rochester*, 241 F.3d 279, 283 (2d Cir. 2001) (quoting *Manoharan v. Columbia Univ. Coll. of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988)). In determining whether a plaintiff has satisfied this initial burden, the court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action and if he carries that burden, it shifts back to plaintiff to demonstrate by competent evidence that the reasons proffered by defendant were pretext for retaliatory animus based upon the protected Title VII activity. *See Sista v.*

*CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).

The Supreme Court has defined an "adverse employment action" in the Title VII retaliation context (distinct from and broader than the standard in the Title VII discrimination context) to mean an action that is "materially adverse" and that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) (internal citations omitted). In particular, "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* at 69, 126 S.Ct. 2405.

Furthermore, under *Richardson v. New York State Department of Correctional Service*, 180 F.3d 426, 444 (2d Cir. 1999), *abrogated on other grounds by Burlington Northern*, 548 U.S. at 68, 126 S.Ct. 2405, the Second Circuit held that "unchecked retaliatory co-worker harassment, if sufficiently severe, may constitute adverse employment action so as to satisfy [that prong] of the retaliation prima facie case." *Id.* at 446; *see also McWhite v. N.Y. City Hous. Auth.*, No. 05 Civ. 0991 (NG)(LB), 2008 WL 1699446, at *11 (E.D.N.Y. Apr. 10, 2008) (applying *Richardson* to a retaliatory hostile work environment claim); *Brown v. N.Y. State Dep't of Corr. Servs.*, 583 F. Supp. 2d 404, 421-22 (W.D.N.Y. 2008) (denying summary judgment on Title VII retaliation claim in part on plaintiff's coworkers' alleged retaliatory acts and citing *Richardson*); *Nugent v. St. Luke's/Roosevelt Hosp. Ctr.*, No. 05 Civ. 5109 (JCF), 2007 WL 1149979, at *13 (Apr. 18, 2007) (considering a retaliatory hostile work environment claim).

Regarding the causal connection prong of the retaliation inquiry, a plaintiff may

establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *See Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990) (holding that causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus"). Where there is no evidence of retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by retaliatory action. *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'") (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal citation omitted)). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[,]" *Gorman-Bakos v. Cornell Co-op. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), some district courts have generally concluded that "a passage of two months between the protected activity and the adverse employment action seems to be the dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03 Civ. 3522(CPS), 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases).

However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson*, 180 F.3d at 446-47 (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier).

### 2. Application

Plaintiff alleges, first, that the Bank retaliated against her after she filed her January 2008 EEOC charge by giving her a negative performance evaluation and denying her a salary increase in 2008. Specifically, plaintiff contends that she had just been assigned to a White supervisor who was "unjustly allowed to make the decision as to whether or not a raise was earned." (Pl.'s Opp. ¶ 35.) It is uncontroverted, however, that the salary increase recommendation and decision cycle was essentially completed prior to the end of 2007 – before plaintiff filed her EEOC charge.[22] The only steps that remained were the Board of Directors' approval of compensation increases on a line of business and firm-wide basis, and communication of the salary decisions to employees. (Def.'s Reply Mem. of Law at 7-8, July 22, 2011,

---

[22] Plaintiff states, "it had already been decided on or before January 25, 2008" by Dorritie and Mounsey that plaintiff was not entitled to a merit increase. (Pl.'s Opp. at ¶ 29.) Thus, it does not appear that plaintiff is contesting defendant's statement that the decision about the salary increase was made prior to plaintiff's filing of the EEOC charge on January 7, 2008. In any event, even if plaintiff is disputing that fact, she has produced no evidence to contradict it.

ECF No. 39.) Furthermore, defendant explains that "it is not unusual for some employees to receive a 'Meets [Expectations]' rating, but not receive any salary increase." (Dorritie Decl. at ¶ 36.) Thus, no rational jury could conclude that this failure to give plaintiff a salary increase was retaliatory.

Second, plaintiff alleges that she was transferred to five different supervisors in two years as retaliation for filing the charge. As a threshold matter, the defendant has provided a detailed explanation for the changes in plaintiff's supervision. Specifically, the changes in supervision were the result of reorganizing, downsizing, and frequent leaves of absence by several of plaintiff's managers. (*See supra* Section I.E for additional detail.) Additionally, one of the reasons plaintiff was moved to a new supervisor was that Neal had complained that she did not have any supervisors present during her late and early evening work hours, so CAF reassigned plaintiff to a team on which the supervisor worked a later schedule. (Def.'s 56.1 ¶ 107.) Plaintiff has offered no evidence to the contrary. Accordingly, no rational jury could conclude that plaintiff's complaints about her reassignment to a different team, and the number of supervisors she had, were motivated by retaliatory animus.

Third, plaintiff alleges that defendant retaliated against her by providing her with fraudulent pay statements in 2009. However, defendant has explained that the errors in the pay statements were inadvertent and likely due to a "system disruption," and, in any event, were essentially harmless, since plaintiff was paid the correct amount and her correct compensation was reported to tax authorities. (Hartmann Reply Decl. ¶¶ 6-7.) Thus, no rational jury could conclude that plaintiff has provided sufficient evidence to demonstrate that defendant's actions with

respect to the pay statements were retaliatory.

Finally, plaintiff alleges that defendant retaliated against her by making it difficult for her to take FMLA leave. (Pl.'s Opp. at ¶ 33.) However, defendant has provided a detailed explanation, discussed *supra* n.19, for its actions with respect to the FMLA leave, which plaintiff has failed to controvert. Thus, no rational jury could conclude that defendant's actions with respect to the FMLA leave were retaliatory.

Accordingly, even construing the evidence most favorably to the plaintiff and drawing all inferences in her favor, no rational jury could conclude that any of these acts were retaliation for plaintiff filing an EEOC complaint.

V. CONCLUSION

For the reasons set forth above, defendant's motion for summary judgment is granted on all claims. Specifically, the uncontroverted facts demonstrate that, under the totality of the circumstances test, plaintiff signed the Release Agreement with the Bank voluntarily and knowingly, and therefore released, *inter alia*, all of the claims she asserts in this action. In an abundance of caution, however, the Court has analyzed the merits of the plaintiff's claims and concludes that, construing the evidence most favorably to the plaintiff and drawing all inferences in her favor, no rational jury could find that any of these acts were motivated by discriminatory animus or were retaliation for plaintiff filing an EEOC complaint. The Clerk of the Court shall enter judgment accordingly and close this case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: August 8, 2012
   Central Islip, NY

* * *

Plaintiff is proceeding *pro se*, 99-15 196th Street, Hollis, NY 11423. Defendant is represented by Frederic L. Lieberman, JP Morgan Chase Legal Compliance Department, One Chase Manhattan Plaza, 26th Floor, New York, NY 10081.